# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JOSE MANUEL GARZA-CASTILLO,

    Petitioner,

v.

MELLODY NALLELY GUAJARDO-OCHOA,

    Respondent.

Case No. 2:10-cv-00359-LDG (VCF)

**ORDER**

    The petitioner, Jose Manuel Garza-Castillo (Jose), petitions (#1) for the return of his child from the United States to Mexico, pursuant to the Convention on the Civil Aspects of International Child Abduction (the Hague Convention), and the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§11602 *et seq*. The respondent, Mellody Nallely Guajardo-Ochoa (Mellody) opposes the petition. The court held an evidentiary hearing on Jose's petition, and the parties have each filed a post-hearing brief (## 70, 71).

    Pursuant to the second paragraph of Article 12 of the Hague Convention, the Court will deny the petition. Jose commenced these proceedings more than one year from the date of the wrongful removal of the child from Mexico to the United States. Mellody has demonstrated, by substantial evidence, that the child is now well settled in its new environment.

### The Hague Convention Governs

Neither Jose nor Mellody dispute the following facts. Mexico and the United States are Contracting States to the Hague Convention. The child was habitually resident in Mexico prior to November 2008. On or about November 1, 2008, Mellody removed the child from Mexico to the United States. Under the laws of Mexico, Jose had rights of custody to the child before the removal. At the time of the removal, Jose actually exercised his rights of custody to the child. Mellody's removal of the child from Mexico to the United States was in breach of Jose's rights of custody. The child, who was born in May 2006, has not yet attained the age of 16 years.

### Consent or Acquiescence

"Under Article 13, the right to a child's return secured by the Hague Convention is extinguished if 'the person ... having the care of the child,' . . . 'consented to or subsequently acquiesced in the removal or retention . . . .' (emphasis added). Under the Hague Convention's plain, unambiguous language, consent before the removal and retention or subsequent acquiescence extinguishes the right of return." *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir.2001)." "Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 372 (3rd Cir. 2005) (internal citations omitted).

In considering consent or acquiescence, "ambiguous statements or actions don't suffice." *Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010). A statement or action must "unequivocally demonstrate that [the petitioning parent] consented to the child's indefinite stay in [America]." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1019 (9th Cir. 2009). The Sixth Circuit has indicated that "acquiescence under the Convention requires either: an act or

statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996).

Jose did not consent to Mellody removing the child from Mexico and retaining her in the United States. Mellody neither argued nor provided any evidence that, prior to her removal and retention of the child, Jose consented to the removal and retention.

Jose did not acquiesce in Mellody's removal of the child from Mexico and her retention of the child in the United States. The series of e-mail communications between Mellody and Jose do not constitute a convincing written renunciation of Jose's rights, and particularly a renunciation of his right to determine whether the child could be removed from and retained outside of Mexico. Mellody relies upon several statements by Jose. First, she cites to Jose's November 13, 2008, e-mail, and in particular to the following phrases: "sign anything with your conditions . . . I will sign the divorce." She further asserts that, as evidenced by her *subsequent* e-mail to Jose, that these conditions were "sole custody" of the child. Mellody also notes that, ultimately, Jose responded with a terse e-mail in which he stated, "I accept," and requested only that "once in a while let me see her or put her on camera."

Initially, the Court would note Mellody's citations to Jose's e-mail communications fail to give full context to his statements. In his November 13, 2008, e-mail, Jose stated:

> I know that you are angry, but think about it and if your decision is another I still want to see my daughter, if you don't love me don't make my daughter hate me, I want to see her please, I will sign anything, with your conditions, you know that I would never take her because I know what that feel like it is unimaginable pain, the revenge like your mom says is enough, she is not at fault I will sign the divorce but don't make me suffer if you want to leave than leave, but give me the opportunity to see [the child] and that she knows that she has a father that loves her.

Rather than indicating an agreement that the child remain in the United States, Jose's statement indicates an agreement to divorce Mellody, grant her full custody of the child, in

exchange for a continued ability to see and visit with the child. Given that Jose resided in Mexico, his statements indicating a continued desire to be able to continue to see his child act as statements that he did not acquiesce to Mellody retaining the child in the United States. Further, the Court cannot construe Jose's final e-mail as a written statement of a willing and voluntary renunciation of his right to decide whether the child could reside outside of Mexico. The Court reaches this conclusion based upon the context of all e-mails, as well as Mellody's sudden and unannounced removal of the child, the lack of any communication from Mellody to Jose indicating where she had taken the child, and Mellody's removal of the child to a location where Jose could not personally visit with the child. At best, Jose's final e-mail is ambiguous, and is more susceptible to an interpretation of Jose's resignation rather than his acquiescence.

Mellody further argues that Jose, by his conduct subsequent to December 2008, implicitly acquiesced in the child's retention in the United States. The Court cannot agree. The passage of time, standing alone, cannot establish acquiescence under the Hague Convention. Mellody notes that, from January 2009 through March of 2010, when Jose filed the present petition, he did not send the child any letters or gifts, did not telephone, and did not respond to "repeated invitations for Skype video contact." Absent from the evidence presented by Mellody, or her argument, is any indication that prior to his petition, she sent Jose an address where he could send gifts or letters, or a phone number that he could call. Though Mellody faults Jose for not accepting invitations to engage in Skype video contacts with the child, she did not offer any evidence that such an invitation was made prior to his filing of the present petition.

Mellody also points to Jose's conduct subsequent to the filing of his petition. That conduct is, at best, ambiguous evidence of whether he acquiesced to the child's retention in the United States prior to the filing of his petition. At a minimum, the Court must construe Jose's filing of and continued prosecution of his petition as evidence that he did

4

not and has not acquiesced to the child's retention in the United States. While Jose's lack of letters and phone calls is troubling, and does suggest an attitude consistent with a decision to acquiesce in the child's continued retention in the United States, in the context of his continued prosecution of his petition to have the child returned to Mexico, the Court cannot conclude that Jose acquiesced to the child's continued retention in the United States prior to filing his petition.

<u>Child's Settlement in Its New Environment</u>

It is undisputed that Mellody removed the child to the United States in early November 2008. Jose filed his petition on March 16, 2010, more than one year after Mellody removed the child to the United States. Pursuant to Article 12 of the Hague Convention, when proceedings are commenced more than one year after the wrongful removal, a child is to be ordered returned "unless it is demonstrated that the child is now settled in its new environment."[1]

Jose has argued (in opposing Mellody's motion to dismiss his petition) that the Court should toll the one-year term because Mellody concealed the child's "exact location" from him, and because he did not have an address for Mellody and the child. The Ninth Circuit has held that equitable tolling is available under the Hague Convention only where "the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return." *Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008).

---

[1] Without citation to any authority, Mellody argues that the court has *discretion* to order the return of the child, and *may* order the child's return unless the child is determined to be settled in its new environment. The argument is contrary to the plain language of Article 12.
  Mellody also argues that Jose's petition was untimely filed. The characterization is not appropriate. The filing of a petition beyond the Article 12 one-year period does not render the petition untimely, but rather permits a responding party to raise a defense that the child is settled is the new environment. Further, if such a defense is not raised, or is not meritorious, Article 12 requires return of the child regardless of whether the petition was filed more than one year after the removal.

5

The evidence received during the hearing indicated that Mellody initially engaged in an effort to conceal the child's location from Jose. When Mellody left in late October or early November 2008, she left a note for Jose. The note, however, did not provide any indication as to where Mellody and the child were going. In her December 28, 2008, e-mail to Jose, Mellody expressed a reluctance to disclose her location (or to return to Mexico) as she perceived a risk of losing the child to Jose.

The Court cannot conclude, however, that Mellody's initial act of concealing the removal and location of the child from Jose "delayed the filing of the petition for return." The Court reaches this conclusion after giving "significant consideration to the overarching intention of the Convention-deterring child abduction." *Duarte*, 526 F.3d at 570.

Jose did not offer any evidence into the record that, subsequent to December 28, 2008, Mellody engaged in an effort to conceal her location from Jose.[2] Rather, the evidence received during the hearing also established that Jose was not only well aware of Mellody's connections to Las Vegas (where she was raised and has numerous relatives) but that he was aware of the addresses of Mellody's relatives in Las Vegas. When Mellody left Mexico, she left behind her address book, which contained the addresses of her relatives in Las Vegas. By the end of January 2009, the names and addresses of Mellody's relatives in Las Vegas appeared in official Mexican documents as locations where Mellody could be located. The documents included the name and address of the aunt with whom Mellody stayed for the first three months in Las Vegas. The documents also include the name of the uncle with whom Mellody stayed during the early part of 2009,

---

[2] Jose offered evidence that Mellody lived at several different addresses subsequent to her arrival in Las Vegas. The record established, however, that the first two addresses were those of relatives. The latter two addresses were those where she lived with Melvin, who is now her husband. Jose did not offer any evidence that Mellody changed locations to avoid being located by him. Rather, the record would indicate that the changes of residence were the result of Mellody and the child becoming increasingly settled in the Las Vegas area.

6

until July 2009 (when Mellody moved in with Melvin).[3]  Mellody was served with Jose's petition at the address where she had resided since July 2009.

      Further, the Court finds little, if any, credible evidence exists in the record to suggest that, subsequent to December 28, 2008, Jose engaged in an effort to locate the child sufficient to warrant tolling of the one-year period.  The Court observed the testimony of Jose during the hearing.  Jose was often inconsistent and evasive.  He acknowledged inconsistencies between his testimony and prior representations made in documents submitted to the Court regarding the factual circumstances of the petition.  He acknowledged that his petition and his opposition to Mellody's motion to dismiss contained numerous erroneous statements regarding the events at issue.  As a result of the Court's observation of Jose and consideration of his testimony, the Court has great difficulty crediting the testimony of Jose as to the actions he engaged in to locate the child.  Further, the Court must note a paucity of evidence regarding Jose's efforts to locate the child after December 28, 2008.  Other than his own testimony, Jose did not offer evidence into the record of efforts made to locate the child.  Also absent from the record is any explanation as to the change in circumstances resulting in Jose being able to locate Mellody and the child in the Las Vegas area in March 2010, but not prior to that date.[4]  While the paucity of evidence of Jose's efforts to contact the child after December 28, 2010, is ambiguous as to whether he acquiesced in the child's retention, that same lack of evidence leads to the conclusion that the one-year term should not be tolled, as Mellody's initial efforts to not reveal the child's location did not delay Jose in filing his petition for the return of the child.

---

[3]     In late April or early May 2010, service of Jose's petition was attempted at the home of this uncle with whom she and the child stayed.

[4]     The Court is aware of Jose's argument that Mellody's "exact location" was not determined until she was served with process in late April or early May, 2010.  The Court is also aware, however, that Jose was sufficiently confident that Mellody was located in the District of Nevada, that he filed his petition in this district in March 2010.

7

As Jose filed his petition more than one year subsequent to Mellody's wrongful removal of the child from Mexico to the United States, the Court next considers whether the child is now settled in its new environment.

Mellody has met her burden of proof of "substantial evidence of the child's significant connections" to the new environment. Public Notice 957, 51 Fed. Reg. 10494, 10509 (March 26, 1986). The Ninth Circuit has indicated the following factors are to be considered in making this determination: (1) the child's age, (2) the stability and duration of the child's residence in the new environment, (3) whether the child attends school consistently, (4) whether the child has friends or relatives in the new environment, (5) whether the child participates in community or extracurricular school activities, (6) and the respondent's employment and financial stability. *Mendoza v. Miranda*, 559 F.3d 999, 1009 (9th Cir. 2009). Further, of these, the factor that is ordinarily the most important is the length and stability of the child's residence in the new environment.

The child was born in May 2006. Mellody removed the child to the United States in late October or early November 2008, when the child was just less than two and one-half years old. Jose filed his petition in March 2010, and served Mellody with the petition in late April or early May 2010, when the child was just less than four years old. At the time Jose filed his petition, the child had spent a significant portion, though not the majority, of her life in the United States. At the time of the evidentiary hearing in January 2012, the child was more than five and one-half years old, and had been living in its new environment for significantly more than half of its life.[5]

---

[5] The Court finds that, in the circumstances of the present petition, the age of the child at the time of the hearing is relevant. Mellody's motion to dismiss, filed several weeks after she was first served with Jose's petition, expressly raised the Article 12 "settled" defense. The Court endeavored, as required by the Hague Convention, to resolve this matter promptly after Jose served Mellody. Nevertheless, with one exception, the matter has been continued either at the unilateral request of Jose or the joint request of the parties. (The only exception is that the Court, due to a scheduling conflict, continued a hearing from August 26, 2010, to September 9, 2010, and then continued the hearing at

8

Upon arrival in Las Vegas, the child resided for several months with Mellody in the home of Mellody's Aunt Dora. The child and Mellody then resided in the home of another of her aunts until July 2009. In July 2009, the child and Mellody moved into a residence of Melvin Albrego, to whom Mellody is now married. The child continued to reside with Mellody and Melvin at that residence for two years. About six or seven months prior to the hearing, the child, Mellody, and Melvin moved to a new residence, where they have since resided. Each of these residences is within the Las Vegas area.

Since the end of August 2011 the child has been enrolled in and attended kindergarten in the Clark County School District. Prior to becoming old enough to attend school, while Mellody was at her place of employment, the child would be in the care of her aunt, with whom Mellody and the child were residing in April 2009. The aunt continued to provide child-care to the child after Mellody and the child moved into the residence of Melvin.

The child, through Mellody, has approximately 50 extended relatives in the Las Vegas area, including her great-grandparents, great aunts and uncles, and cousins. The child regularly (often on a weekly basis) meets with and participates in events with her extended relatives. The child's relatives include young children with whom the child interacts. The child often meets with her extended relatives and knows them by name.

---

the request of Mellody to October 20, 2010, to provide her an opportunity to respond to a substantial filing by Jose of supplemental exhibits.) Further, commencing in March 2011, the parties stipulated to continue these proceedings to explore the resolution of the underlying custody and visitation issues through the Family Mediation Center.

Finally, pursuant to Article 12, the court must order the return of the child, unless the child "is now settled in its new environment." The language of both the first and second paragraphs of Article 12 recognizes that proceedings under the Hague Convention can be commenced within one year of a removal, but the decision whether a return must be ordered can occur more than one year after the removal. The "settled" defense, in the second paragraph, looks to the child's circumstances at the time of the Court's decision whether to order the return, rather than the commencement of the proceedings. Stated otherwise, Article 12 requires the court to determine whether "the child is now settled" rather than whether "the child was settled when proceedings commenced."

9

Melvin, who is now married to Mellody, has between 80 and 100 extended relatives in the Las Vegas area. Typically, Melvin, Mellody and the child have a family dinner at the home of Melvin's mother on Tuesdays. The child often meets with Melvin's extended family, and knows many of them by name. The child treats Melvin's extended family as if they were the child's extended family.

The child has created friendships with other children who are not her relatives. The child spends time with her friends, including attending events and birthday parties. The court received testimony that, with at least one other child, the child has maintained a friendship for three years.

The child and Mellody attend church two or three times each month.

Mellody has been employed since April 2009 with the same employer, earning approximately $1500 to $2000 bi-weekly. Melvin is also employed.

In his closing brief to the Court, Jose does not address the issue of whether the child is now well-settled in Las Vegas.[6] During the hearing, Jose's counsel directed questions establishing that Mellody and the child have lived at four different residences since arriving in Las Vegas in November 2008. The evidence, however, indicates an increasing level of stability, with Mellody and the child living with two different relatives for the first seven months, and then living with Melvin since that time. Further, in residing with Melvin, Mellody and the child lived at the same residence for two years, only recently moving to a new residence. Jose did not offer any evidence suggesting that the child's recent change of residence could be attributed to an instability in living arrangements.

---

[6] At most, Jose acknowledges at page 12 of his closing brief that his petition was filed more than one year after the child's wrongful removal from Mexico.

During the hearing, Jose's counsel directed questions establishing that Mellody and the child are in the process of changing their immigration status.[7] Jose raised similar arguments in his opposition to Mellody's motion to dismiss. As indicated by the Ninth Circuit, "[i]n some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation." *Mendoza*, 559 F.3d at 1009. The record lacks any evidence of an immediate, concrete threat of deportation.

As these proceedings were commenced more than one-year after the wrongful removal of the child from Mexico to the United States, and as the one year period should not be equitably tolled, and as the child is now well-settled in its new environment, therefore:

THE COURT **ORDERS** that the Petition for Return of Child (#1) is DENIED.

DATED this __15__ day of February, 2012.

_____
Lloyd D. George
United States District Judge

---

[7] The questions by Jose's counsel that were directed at several of Mellody's relatives regarding their immigration status served only to reinforce an observation of the circuit court: "current immigration status-a status similar to that of many millions of undocumented immigrants-cannot undermine all of the other considerations which uniformly support a finding that [a person] is 'settled' in the United States." *Mendoza*, 559 F.3d at 1010.

11